IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| RANDALL E. MANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:09CV1174-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF OPINION

Plaintiff Randall E. Mann brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his applications for disability insurance benefits and supplemental security income under the Social Security Act.  The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

## BACKGROUND

Plaintiff was born on November 21, 1964, and left school after ninth grade. (R. 127, 167, 388).  He has past relevant work as a house painter.  (R. 178-86; see also R. 146-47).  He filed the present applications for benefits in May 2007 (Exhibits 1D and 2D), alleging that he became disabled on January 15, 2006, due to spider bites, staff infections, high blood

pressure, heart problems and high cholesterol.  (R. 162).

In March 2004, plaintiff had arthroscopic surgery on his right knee to repair a medial meniscus tear.  (R. 377-80, 516-17).  In September 2004, he sought treatment for right knee pain at the emergency room after he fell from a ladder while painting; he was diagnosed with right knee strain.  (R. 372-76).

In May 2005, plaintiff – who was then grieving the loss of his brother due to a sudden heart attack – was admitted to the hospital for two days after he consumed a lot of alcohol and "took a lot of cocaine and had a reaction to it."  He stated that he "might" have had some chest pain, but there was no evidence of that during his hospitalization. A chest x-ray, however, revealed borderline cardiomegaly. At the time of his discharge, plaintiff's physician, Dr. Schuster, arranged a stress test and advised plaintiff that "he needed to stay away from cocaine no matter what, because he reacts very poorly to it."  (R. 333, 356).  Plaintiff returned to the ER on May 16, 2005, reporting chest pain that had not resolved with nitroglycerin.  His symptoms resolved after administration of a GI cocktail, and he was diagnosed with indigestion.  (R. 344-48).  After an abnormal stress test on May 23, 2005,[1] Dr. Kevin Ryan, a cardiologist, conducted a catheterization and concluded that plaintiff had normal systolic and diastolic function, and minor non-obstructive atherosclerotic vascular disease – which Dr. Ryan described as "only mild coronary artery disease."  (R. 233; see Exhibit 2F; R. 342-43).

_____

[1] Dr. Ryan noted on this date, under social history, "[s]ignificant for smoking."  (R. 235).  There is no indication that plaintiff advised Dr. Ryan of his history of cocaine use.  (See id.; see also R. 333 (May 2005 use of "a lot" of cocaine), R. 381 (May 2001 hospitalization by Dr. Schuster after overdose of Valium; drug screen positive for cocaine.)).

On July 8, 2005, plaintiff again presented at the hospital with chest pain.  (R. 334).  His drug screen was again positive for cocaine.  (R. 336).  On September 28, 2005, plaintiff was admitted to the hospital overnight after he presented with a two-day history of "pleuritic like chest pain, malaise, cough, [and] sputum."  Plaintiff's drug screen was again positive for cocaine.  Dr. Ryan evaluated him and concluded that plaintiff's chest pain was not cardiac, but felt that he should have an outpatient stress test.  On discharge, Dr. Schuster again advised plaintiff to "quit smoking tobacco and use no Cocaine [and] explained that this could cause a heart attack as well as lung problems, severe hypertension and stroke."  (R. 233, 328-29).

On January 15, 2006, plaintiff went to the emergency room, complaining of a spider bite on his right thigh that had caused a red area with a dark spot. He was diagnosed with anxiety and a spider bite and discharged with prescriptions for Avelox and an antibiotic ointment, and a work excuse estimating that he would need to be off from work for two days. (R. 313-21). The following day, Dr. Schuster admitted plaintiff to the hospital for IV administration of antibiotics. He developed a staph infection and cellulitis, and was discharged on January 20, 2006 with "vast improvement" after further treatment. (R. 297-98, 324-26). Plaintiff saw a nurse practitioner at Dr. Schuster's office for follow-up on January 21st, 24th, and 30th. (R. 248-49). In an April 6, 2006, office visit with Dr. Schuster, plaintiff sought medication for depression. Dr. Schuster noted that plaintiff was "on ETOH." He prescribed Lexapro and advised plaintiff to stop drinking.  (R. 248)("D/C ETOH").

On June 7, 2006,[2] plaintiff again sought treatment at the ER for a spider bite, this time above his left knee, and on July 7, 2006, he sought treatment at the ER for headaches, diarrhea, nausea, vomiting and chest pain. (R. 310, 300-06).[3] In mid-August, Dr. Durant admitted plaintiff to the hospital for administration of IV antibiotics to treat cellulitis and a staph infection in plaintiff's right knee. He was discharged after four days "with vast improvement." Dr. Durant arranged for plaintiff to see Dr. Lee England, a surgeon, to determine whether the wound needed to be debrided.  (R. 276).  Dr. England evaluated the wound on plaintiff's knee the following day, on August 23, 2006.  He wrote, "I feel that this cellulitis is certainly related to a previous spider bite and seems to be resolving. I did pack the wound today with Iodoform and have instructed him to pack the wound daily." He told plaintiff to continue on Bactrim and to return in one week to determine whether any further treatment was necessary. (R. 289). There is no indication that plaintiff sought further treatment at Dr. England's office.[4]  However, he saw Dr. England two weeks later, when he sought treatment at the emergency room, complaining of severe pain due to the abscess in his knee and reporting that he was out of pain medication.  (R. 292-96).[5]

Later that month, on September 21, 2006, Dr. Schuster admitted plaintiff to the hospital

---

[2]  The triage nurse's handwritten date is "7/6/05."  (R. 310).  However, the bar-coded date stamp reads "06/07/06."  (Id.).  When plaintiff followed up with his primary care physician the next day, Dr. Schuster wrote, "Smells ETOH."  (R. 247).

[3]  A consultation note for the latter emergency room visit is illegible. (R. 306). Plaintiff was discharged from the ER with instructions to drink plenty of fluids and follow up with his regular doctor; he was given a work excuse for two days.  (R. 305).

[4]  Plaintiff testified that he "stayed in the hospital for over something like a month" from the second spider bite.  (R. 34).  He provided no records evidencing a month-long hospitalization.

[5]  Dr. England noted, at that time, that plaintiff's gait was normal.  (R. 294).

overnight when plaintiff "presented with left-sided chest pain that started that morning and was unrelated to activities." (R. 287). He noted that plaintiff "had been drinking heavily and using some cocaine over the weekend. He used cocaine up until that morning and then came to the emergency room." (Id.). Dr. Schuster treated plaintiff with IV fluids, and "also started Nitro paste and Lovenox because of the cocaine use, nature of the pain, strong family history and the risk factors[,]" . . . and, also, Protonix, aspirin and Ativan. (Id.). Chest x-ray, EKG, initial cardiac enzymes, and serial EKGs and enzymes were all negative. (Id.). Dr. Schuster diagnosed chest pain, cocaine abuse, and gastroesophageal reflux, and arranged a stress echocardiogram for the following week. (Id.). On September 27, 2006, Dr. Ryan conducted a stress echocardiogram; he concluded that the test was "negative," showing only mild abnormalities without evidence of acute ischemia. In the section of the report for recommendations, Dr. Ryan stated, "None." (R. 214, 231, 236-37; Exhibit 1F, 2F). The record does not evidence any further treatment by Dr. Ryan, or any other cardiologist, for cardiac problems. On October 10, 2006, plaintiff saw Dr. Schuster, complaining of right knee pain and anxiety. Dr. Schuster prescribed Ativan and Tylenol-3. (R. 246). Plaintiff returned on November 20, 2006, still complaining of knee pain. Dr. Schuster diagnosed osteoarthritis. (R. 245).

On January 2, 2007, plaintiff was treated at the emergency room for a spider bite above his right knee, which resulted in a local area of cellulitis without any abscess. He was treated with an antibiotic and advised to follow up with Dr. England the next day, as incision and drainage might be required if an abscess developed. (R. 281-282). In early February 2007,

plaintiff fell, hitting his neck and the back of his head. (R. 58). A CT scan of plaintiff's head resulted in no acute findings, and a cervical spine x-ray was normal. (R. 278-79). In office visits to his primary care physician[6] in February, March and April, plaintiff complained of headaches, controlled by Lortab, and dizziness. His doctor diagnosed post-concussion syndrome. (R. 243-45). On April 9, 2007, plaintiff was treated at the ER for cellulitis of his right eye and cheek after he had a tooth pulled and again developed a staph infection. (R. 265-74).

On May 3, 2007 (protective filing date), plaintiff filed the present applications for benefits. On May 14, 2007, he saw Dr. William Blythe, an ENT specialist, for his facial cellulitis. Dr. Blythe performed a CT scan of plaintiff's sinuses which demonstrated no evidence of sinusitis. He treated plaintiff with an antibiotic, scheduled him for follow-up in one week, and planned to do an incision and drainage or referral to an infectious disease specialist if it had not improved on follow-up. (R. 385). The record does not include any further evaluation or treatment by Dr. Blythe.

Lee Stutts, Ph.D., performed a consultative psychological examination on July 24, 2007. (Exhibit 5F). He did not identify any deficiencies or abnormalities in his mental status examination of the plaintiff, except for the depression symptoms reported by plaintiff. (R. 388-89). He diagnosed "Major Depressive Diagnosis, Single Episode, moderate," and history

---

[6] In the handwritten treatment notes from Lake Martin Family Medicine, the physicians' signatures are illegible, so the court cannot discern with any certainty whether plaintiff saw Dr. Schuster or Dr. Durant on many of the office visits. (See Exhibits 3F, 15F). Both physicians practice at Lake Martin Family Medicine. (See R. 473).

of polysubstance abuse;[7] he include "rule out" diagnoses of pain disorder and generalized anxiety disorder.  (R. 389). Dr. Stutts concluded:

> Mr Mann is a 42 year old man who complains of depressive symptoms that emerged about two years ago.  He has not been in treatment by a mental health professional. He also complained of difficulties working since being bit by spiders in 2006.  Mr Mann should be able to return to work once his depressive symptoms are improved and if cleared medically.

(R. 389).  Dr. Stutts stated that plaintiff's prognosis was "Fair with treatment and Vocational Rehabilitation Services support."  (Id.).

The following day, plaintiff reported to Dr. Frances Bartel for a consultative physical examination.  (Exhibit 6F).[8] Dr. Bartel diagnosed hypertension with ankle edema, glucosuria, "TR hematuria," hyperlipidemia, arthritic knee pain, cellulitis of both lower lids, cephalgia, dental deficiencies and generalized anxiety disorder.  She concluded that he can sit with "no problem," that his ability to stand and walk is limited by knee pain[9] and, as to travel, that he drives himself.  (R. 399).

On July 26, 2007, and August 28, 2007, plaintiff saw his doctor due to his increased blood sugar levels; he reported continued knee pain. (R. 507).  Six days before the latter office

---

[7]  In the medical history section of his report, Dr. Stutts wrote, "Currently there is a history of cannabis abuse but he denied other drug abuse. He has not used other drugs in the past three years." (R. 387).

[8]  Plaintiff told Dr. Bartel that he had not used street drugs for "4 yrs or longer" and that he seldom drinks alcohol.  (R. 391-92).  As noted above, however, plaintiff was admitted to the hospital on September 21, 2006, after drinking heavily and using cocaine over the weekend.  (R. 287).

[9]  Dr. Bartel noted some limited range of motion in plaintiff's right knee and both ankles (R. 400) but observed that he had "no problem getting on & off exam table," his "gait & station are WNL," "no assis[]tive device needed or used," "Romberg is normal w no ataxia or spasticity," "squat & rise and toe, heel, tandem are OK" (R. 397).

visit, plaintiff had a right knee x-ray which was assessed as negative. The consulting radiologist wrote, "Two views were obtained. The compartment spaces of the knee joint are maintained. There is no fracture or subluxation. Articular surfaces are smooth and normal in appearance." (R. 403). A left ankle x-ray taken at the same time was also reported to be negative, with "[n]o degenerative arthritic changes identified." (R. 404).

Plaintiff returned to his primary care doctor on September 18, 2007, less than a month after the x-rays. The intake nurse wrote, "Lawyer wants him to come in [every] 2 wks [related to] disability. Knee not getting any better." (R. 506). On this occasion, plaintiff's doctor diagnosed "Severe OA, [right greater than left] knee" and non-insulin dependent diabetes mellitus. (Id.). At the following visit nine days later, plaintiff's complaint was "Rt knee pain/Fill out paperwork for Faye Edmondson [plaintiff's attorney]/med eval with pain[.]" (R. 506). A week later, plaintiff returned to the doctor, complaining of right knee pain. (R. 505).

On October 18, 2007, plaintiff went to the ER, with a chief complaint of "broken foot," reporting that he had twisted his foot. On examination, plaintiff had tenderness and swelling on the top of his right foot, and reported mild pain and tingling and numbness. The ER physician ordered x-rays of plaintiff's right foot and ankle. He diagnosed plaintiff with a contusion of his right foot and ankle. (R. 463-66).

On November 27, 2007, at 10:30 a.m., plaintiff went to the ER complaining of an abscess on his right hip from a possible spider bite four days previously. Dr. Schuster

evaluated plaintiff at the ER, diagnosed cellulitis, and prescribed an antibiotic.[10] (R. 468-71).

At some point that same day, plaintiff saw Dr. Schuster in an office visit at Lake Martin

Family Medicine, in which plaintiff complained of chronic right knee pain and anxiety. (R.

505). Dr. Schuster assessed "mild OA" of the knee and anxiety. (Id.). On January 13, 2008,

plaintiff sought evaluation for "nerves." He reported that he had started drinking "3 weeks

ago." The physician indicated that plaintiff's musculoskeletal examination was "Nor[mal],"

and he diagnosed non-insulin dependent diabetes mellitus and anxiety. He advised plaintiff

to discontinue use of alcohol. (R. 504). On February 25, 2008, plaintiff reported pain,

decreased sleep and that he was still anxious at times. The doctor again diagnosed diabetes.[11]

Two weeks later, plaintiff returned, asking that his doctor complete disability paperwork. He

reported "knee pain – twisted – Flared up 5 days ago," headache and blurred vision. His

doctor diagnosed hypertension, coronary artery disease, and "severe OA" of the right knee.

(R. 503).

On that date, March 11, 2008, Dr. Schuster completed five forms for the plaintiff:

(1) "Medical Statement Concerning Depression for Social Security Disability Claim,"

(2) "Medical Statement Regarding Heart Arrhythmias for Social Security Disability Claim,"

(3) "Medical Statement Regarding Knee Problem for Social Security Disability Claim,"

(4) "Medical Statement Regarding Diabetes for Social Security Disability Claim," and

---

[10] Dr. Schuster indicated "∅" in the space on the form provided for recording reported "joint pain." (R. 469).

[11] The doctor noted decreased flexion of the right knee, at 90°, and full extension. An additional diagnosis is partially illegible. (R. 504)("[right] lat [illegible]").

(5) "Medical Source Opinion Form (Physical)."  (Exhibit 12F, R. 443-457).  In the first of these forms, Dr. Schuster noted a diagnosis of generalized anxiety disorder.  He expressed his opinion that plaintiff: (1) suffers marked limitations in activities of daily living and maintaining social functioning; (2) has deficiencies of concentration, persistence and pace resulting in frequent failure to complete tasks in a timely manner; and (3) has repeated episodes of deterioration or decompensation in work or work-like setting which cause him to withdraw from the situation or experience exacerbation of signs and symptoms, which may include deterioration of adaptive functioning.  (R. 444).  Despite his conclusion that plaintiff has "marked" limitations in maintaining social functioning, he indicated no marked work limitations in areas related to interacting with supervisors or co-workers – specifically, Dr. Schuster indicated only moderate limitations in plaintiff's ability to work in coordination with and proximity with others without being distracted by them, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, and respond appropriately to changes in the work setting. While he found plaintiff to be markedly limited in his ability to understand and remember short and simple instructions, he found him to be only moderately limited in his ability to carry out very short and simple instructions.  He indicated that plaintiff also has marked limitation in his ability to: remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for

extended periods; and to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Dr. Schuster wrote nothing in the section of the form designated for "[c]omments." (R. 444-47). On the "heart arrythmia" form, Dr. Schuster noted that plaintiff suffers "recurrent arrhythmias despite prescribed treatment not related to reversible causes, specifically, "[a]trial ectopic beats." He noted that these arrhythmias had been documented by "[r]esting electrocardiography." He indicated that plaintiff suffers palpitations and, further, that he suffers episodes of "syncope or near syncope due to heart arrhythmias" more than once a day. Again, he provided no "[c]omments" in the designated section. (R. 448-50). On the "knee problem" form, Dr. Schuster indicated that plaintiff has chronic pain, stiffness, swelling, tenderness, limitation of motion, and crepitus in his right knee. He also indicated that plaintiff has "[j]oint space narrowing" in his right knee"[12] and an "[i]nability to ambulate effectively,"[13] again without providing comments (R. 451-52). On the "diabetes" form, Dr. Schuster indicated that plaintiff has Type II diabetes and neuropathy; he included no "[c]omments." (R. 453-54). In three of the forms, Dr. Schuster circled answers indicating that plaintiff: (1) can never bend, stoop, balance, climb a ladder or climb stairs; (2) can lift ten pounds occasionally and five pounds frequently; (3) can stand for thirty minutes at a time, sit for two hours at a time, and work one hour per day; and (4) suffers from "[s]evere" pain. (R. 449-54).

---

[12] The consulting radiologist had concluded just six and a half months earlier that two x-rays showed that the "compartment spaces of the [right] knee joint are maintained." (R. 403).

[13] The form provided to Dr. Schuster does not include an explanation of the phrase "inability to ambulate effectively" as defined in the Commissioner's regulations, *i.e.*, as an "extreme limitation of the ability to walk." 20 C.F.R. Part 404, Subpt. P, App. 1, ¶ 1.00(B)(2)(b)(1).

In the fifth form he completed on the same day, the "Medical Source Opinion (Physical)," Dr. Schuster indicated that plaintiff has the ability to stand for a half hour at a time for a total of two hours in an eight-hour day, to walk for a half hour at a time for a total of two hours in an eight-hour day, and sit for two hours at a time, for a total of four hours in an eight-hour day. (R. 455). He indicated that, in an eight-hour day, plaintiff can never lift and carry more than twenty pounds, occasionally (up to 1/3 of the time) lift and carry twenty pounds, frequently (from 1/3 to 2/3 of the time) lift and carry ten pounds, and constantly (more than 2/3 of the time) lift and carry five pounds. (Id.). He indicated that plaintiff can: never balance, stoop, kneel, crouch or crawl; occasionally push/pull with his legs, climb and reach overhead; and frequently push/pull with his arms, handle, finger, feel, talk and hear. (R. 456). He limited plaintiff to occasional work in all listed environments, including proximity to moving mechanical parts; high, exposed places; driving automotive equipment and "Other (specify)[.]" (R. 457).[14]

On May 4, 2008, plaintiff's doctor prescribed Effexor; the following day, plaintiff stated that he thought he was having a reaction to the Effexor, and reported that he had no energy, muscle weakness, an upset stomach, diarrhea, insomnia and headache. The doctor diagnosed depression and anxiety and changed plaintiff's medication. (R. 503). On May 12, 2008, plaintiff returned for the results of his blood work and for medication refills. The doctor indicated that plaintiff's musculoskeletal examination was normal. He diagnosed hypertension

---

[14] Dr. Schuster did not specify the nature of the "[o]ther" environment in which plaintiff could work only "[o]ccasionally." (R. 457).

and depression.  On June 9, 2008, plaintiff reported for a "med eval w/ pain," but left before the doctor saw him.  (R. 502).  Plaintiff returned two days later, reporting pain and a "knot" in his right knee.  The doctor diagnosed knee osteoarthritis and depression.  Nine days later, on June 20, 2008, plaintiff reported another possible spider bite. The doctor observed that plaintiff's knee was reddened and tender and that the right knee had a "raised area under patella," and he diagnosed cellulitis of the left knee. (R. 501). Plaintiff's infection was drained at Lake Martin Community Hospital emergency room that day, and he went to the ER for treatment of the wound/abscess on both knees on June 23rd,[15] June 28th,[16] and July 3rd, 2008. (R. 474-85). On the latter date, Dr. Durant determined that plaintiff's bilateral cellulitis of the knees was "vastly improved," and he discharged plaintiff from the ER with a prescription for an antibiotic and Lortab – "just # 36 of them" – for discomfort.  (R. 485-86).

Plaintiff returned to Lake Martin Family Practice three weeks later, on July 24, 2008, complaining of bilateral knee pain and, on August 18, 2008, for refills on his medication; although his vital signs are recorded for those dates, there are no treatment notes reflecting evaluation by a physician. (R. 500).  Plaintiff sought treatment at the ER on September 2, 2008 for an abscess on his right forearm.  (R. 497-90).

On September 29, 2008, plaintiff returned to Dr. Durant, complaining primarily of pain in both knees.  The section of the treatment notes for recording physical examination does not

---

[15]  On this date, Dr. Cobb indicated normal range of motion of the extremities and no pedal edema. (R. 477).

[16]  On June 23rd, plaintiff reported that the lesions on his knees had started 4-5 days earlier; on June 28th, he reported that they had started one month previously.  (R. 476, 480).

indicate that Dr. Durant performed a musculoskeletal examination.[17]  Dr. Durant noted "No abnormalities to gait" and "[n]o motor or sensory deficits."  For "clinical impression," he noted, "Disability paperwork completed."  He assessed knee osteoarthritis, questionable early neuropathy, Type II diabetes mellitus, and hypertension.  (R. 498-99).  He completed a clinical assessment of pain form in which he circled a response indicating that "[p]ain is present to such an extent as to be distracting to adequate performance of daily activities[,]" that physical activity would cause "[s]ome increase" in plaintiff's pain level "but not to such an extent as to prevent adequate functioning[,]" and that plaintiff's medications cause "[s]ome limitations [as to work activity] ... but not to such a degree as to create serious problem in most instances."  (R. 458).  He did not respond to a query regarding whether plaintiff has "an underlying medical condition consistent with the pain he or she experiences."  (Id.).  In a "medical source statement" form, he indicated that plaintiff has COPD and should avoid dust, fumes, and extremes of temperature, humidity and other environmental pollutants[.]" (R. 459).  He noted that plaintiff does not need an assistive device "to ambulate even minimally in a normal work day," that he can sit for two hours and stand or walk for two hours in an eight-hour work day, and that he needs two hours of rest during the day in addition to normal morning, afternoon and lunch breaks.  (Id.).  Dr. Durant indicated that plaintiff can lift twenty pounds occasionally and ten pounds frequently.  (Id.).  He noted that plaintiff can never work around hazardous machinery and rarely climb, balance or operate a motor vehicle.  (Id.).  He indicated that plaintiff can reach, including overhead, up to 33% of an 8-hour work day and

---

[17]  He may have done so, but it is not recorded in the treatment note.  (See R. 498).

can frequently (defined on the form as "up to 66% of an 8-hour day") push and pull with arm and leg controls, perform gross and fine manipulation, and bend and/or stoop.  (R. 460).  He checked a response indicating that plaintiff would likely be absent from work more than four days per month as a result of his impairments or treatment.  Paragraph 8 of the form reads, "State the medical basis and the diagnosis for these restrictions:" and provides a few lines for such a statement.  Dr. Durant wrote nothing in response.  He checked "Yes" to indicate that he believes plaintiff's complaints of pain and that there is "objective evidence which could reasonably be expected to cause this degree of pain."  In response to a query regarding the condition that would cause pain, he wrote, "Pt has knee OA."  In response to the question, "What objective findings demonstrate this condition," Dr. Durant did not identify any objective findings; instead he provided only his conclusion that "exam shows this."  (R. 460).
 He checked "Yes" to indicate that plaintiff's ability to perform activities would be further reduced by pain, that pain is present when he is at rest, and that he has seen "objective evidence of pain."  When asked to "list" it, he wrote, "chronic knee pain is [illegible]."  (R. 461).  He checked the rating indicating that plaintiff's pain is "Moderately Severe," and wrote that he has been functioning on the level indicated by the form for "quite some time." (Id.) In the "Comments" section, he wrote, "This patient has DM, blood pressure problems, COPD and chronic knee pain." (Id.).  He indicated that plaintiff's "occasional usage [illegible] of narcotics causes difficulties" that would adversely affect plaintiff's ability to work.  (Id.).

Plaintiff returned to Dr. Durant two months later, complaining of knee pain, dizziness, blurred vision, headache, depression and vomiting. Dr. Durant noted decreased range of

motion of plaintiff's knee, but "[n]o abnormalities to gait," and "[n]o motor or sensory deficits." He assessed hypertension, osteoarthritis, diabetes mellitus and anxiety. (R. 496-97). Dr. Durant saw plaintiff again three weeks later, on December 16, 2008, when he complained of knee pain, and that his knees had started "locking." The treatment note reflects no musculoskeletal examination. Dr. Durant noted "[n]o abnormalities to gait" and "[n]o motor or sensory deficits." He assessed diabetes mellitus, hypertension, neuropathy and arthritis. (R. 494-95). Plaintiff returned to Dr. Durant on February 5, 2009 for a blood pressure check. On this occasion, Dr. Durant noted "knee decreased ROM." He noted "[n]o abnormalities to gait," however, and "[n]o motor or sensory deficits." He assessed osteoarthritis of the knees, hypertension, neuropathy, anxiety and COPD. (R. 492-93).

At the administrative hearing before the ALJ on April 14, 2009, plaintiff testified as follows:

He has pain in his right knee, right ankle and foot (at times) and has been getting cramps in his right had for about five or six months. He is 5'7" tall and weighs "about 235." His normal weight is 180 but he has gained weight since he stopped working and since he was diagnosed with diabetes in 2007. He is diabetic but has not had to go to the emergency room for any kind of diabetic problems and he is on a diabetic diet. He is supposed to limit his carbohydrates but could not recall how many grams of carbohydrates his diet permits in a day. He knows he is eating too many carbohydrates if he "get[s] to feeling weak." His pain in 2006 was at a level of between five and six, but it is now between a six and a seven, on a scale of ten, "[j]ust about every[ ]day[,]" even with his pain medicine. He has been wearing a knee

brace since his knee surgery and, in March 2009, he slipped while he was going up steps with his crutches.  Before March 2009, he used his crutches "one or two probably two or three days a week."  The ER prescribed crutches for him in March, but he already had a set and Dr. Durant had told him to use them when his knee was "feeling bad."[18]  The only side effect he has noticed from all of his medication is that he has put on weight. (R. 31-42).  The ALJ asked whether plaintiff had ever had to go to the hospital for kidney damage or fainting, and plaintiff responded that he had gone "mainly [for] staph infections and stuff like that."  He drove a little before March 2009, about ten miles a week, but does not drive now. (R. 43).  He has not used marijuana since his early 20s and has not used alcohol in over a year. He cut his smoking to about five cigarettes a day because of his breathing, and he has noticed "a whole lot" of difference with it "getting better and better" in the two months since he had cut back on smoking.  (R. 46-47).

On questioning from his attorney, plaintiff testified that he has headaches twice a day that last for two hours at a level of six or seven. His doctors are "probably going to have to put in an artificial knee this time" and they will "probably wind up doing both of them this time."  He still has problems from the spider bites, which causes him to have to get it lanced "about once every six months." (R. 49-51).  He fractured his right ankle in 2007 and the ankle swells a lot and he still has pain from it.[19]  He gets the hand cramps once or twice an hour.

---

[18]  Plaintiff provided no evidence of medical treatment for this March 2009 knee injury.

[19]  Plaintiff complained of a broken right foot in an ER visit in October 2007; however, after having x-rays performed, the ER doctor discharged plaintiff from the ER with a diagnosis of "contusion" of his right foot and ankle.  (R. 463-66).

He has "[v]ery little" pain from the cramps, but "[i]t's like [he is] steadily trying to grip something.  His ability to use his right hand varies.  The heaviest weight he can lift and carry is "[p]robably five pounds."  (R. 52-53).  He tries to take breaks about every fifteen minutes and he keeps his leg "propped [up] most of the time."  He cannot climb a few steps without crutches.  He initially testified that he quit using illegal drugs in 2006 or 2007; his attorney reminded him that his onset date is in 2006 and asked if he stopped using drugs "before [he] got disabled" and he responded that he had.  He testified that he "stayed in the hospital for a week and a half" due to the staph infection in his eye.  (R. 54).[20]

The ALJ rendered a decision on June 4, 2009.  He found that plaintiff has "severe" impairments of "chronic obstructive pulmonary disease; hypertension; arthritis of the right knee; diabetes mellitus type 2; obesity; status post head trauma and cephalgia (2007); and generalized anxiety disorder."  (R. 18).  He found that plaintiff has non-severe impairments of "cellulitis lower eye lids; status post knee injury (2004); hyperlipidemia; status post right forearm abscess; status post spider bites (2006); [and] status post bilateral knee cellulitis." (Id.).  He found that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the impairments in the "listings" (R. 21). He determined that plaintiff retained the residual functional capacity to perform the full range of sedentary work exertionally, with some nonexertional limitations:

> [Claimant has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). Specifically, the claimant can lift and carry 20 pounds occasionally and 10 pounds

---

[20]  The medical record evidences outpatient treatment for this staph infection.  (R. 268-74).

frequently; he can stand and walk at least 2 hours in an 8-hour workday; he can sit about 6 hours in an 8 hour workday; no pushing and pulling with the right lower extremity; no climbing of ladder/rope/scaffolds; occasional climbing of ramp/stairs; frequent balancing; occasional stooping; no kneeling; occasional crouching; no crawling; no manipulative limitations; no visual limitations; no communicative limitations; avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, and fumes/odors/dusts/gases/poor ventilation, etc[.]; unlimited exposure to noise; avoid all exposure to hazards (machinery, heights, etc.). From a mental residual capacity viewpoint he has a: moderate limitation in ability to respond appropriately to customers or other members of the general public; moderate limitation in ability to respond appropriately to supervision; moderate limitation in ability to respond appropriately to co-workers; and moderate limitation in ability to respond to customary work pressure. The claimant has: no limitation in ability to use judgment in simple one or two step work related decisions; no limitation in ability to use judgment in detailed or complex work related decisions; a moderate limitation in ability to understand, remember, and carry out simple one and two step instructions; a moderate limitation in ability to understand, remember and carry out detailed or complex instructions; a moderate limitation in the ability to maintain attention, concentration, or pace for periods of at least 2 hours; and on a 1-10 pain scale, experiences a 5 level pain.

(R. 22-23). The ALJ determined that plaintiff cannot perform his past relevant work as a house painter (R. 25). He found, consistent with the testimony of the vocational expert at the hearing (R. 60-64),[21] that plaintiff can perform other jobs that exist in significant numbers in the national economy, including surveillance system monitor, charge accounts clerk and addressing clerk. (R. 26). Thus, he concluded that plaintiff was not under a disability, as defined in the Social Security Act, from his alleged onset date of January 15, 2006 through the date of the decision. (R. 27). On October 30, 2009, the Appeals Council denied plaintiff's

---

[21] The ALJ found, erroneously, that plaintiff has "at least a high school education." (R. 25). This error in the written decision is harmless, however. The vocational expert was present for plaintiff's hearing testimony that he has a ninth grade education (R. 30-31) and the ALJ's hypothetical question to the VE did not ask her to assume a high school education.

request for review (R. 1-3) and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed de novo because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985 F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

Plaintiff contends that the ALJ erred in rejecting the opinion of her treating physicians, Dr. Schuster and Dr. Durant. "If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record,

the ALJ must give it controlling weight." <u>Roth v. Astrue</u>, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)).  "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" <u>Id</u>. (citing <u>Crawford v. Commissioner</u>, 363 F.3d 1155, 1159 (11th Cir. 2004)).  "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." <u>Pritchett v. Commissioner, Social Security Admin</u>, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing <u>MacGregor v. Bowen</u>, 786 F.2d 1050, 1053 (11th Cir. 1986)).  "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. <u>Schuhardt v. Astrue</u>, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1212 (11th Cir. 2005)).

In this case, the ALJ found that the treating physicians' opinions were not supported by their own treatment records. (R. 24-25). He also cited specific instances of internal inconsistencies in the disability forms completed by the physicians.  (<u>Id</u>.).  He observed, for example, that Dr. Durant found that plaintiff "notes pain to such a degree that it would distract the claimant from adequate performance of daily activities; he then notes that increased physical activity would increase the pain but not to such an extent as to prevent adequate functioning of tasks."  (R. 24; <u>see also</u> R. 458).  The ALJ noted Dr. Schuster's conclusion on two of the forms he completed (the diabetes form and the knee problem form) that plaintiff

could work for only one hour a day, and his conclusion in the medical source opinion form that plaintiff could stand and walk for two hours each in an 8-hour workday and sit for four hours in an 8-hour workday (R. 25; see R. 451, 453, 455).  The ALJ also observed that while Dr. Schuster indicated in the diabetes and knee problem forms that plaintiff could lift ten pounds occasionally and five pounds frequently, the medical source opinion form sets forth Dr. Schuster's opinion that plaintiff can lift/carry five pounds constantly, ten pounds frequently, and twenty pounds occasionally.  (R. 25;p see R. 451, 454, 455).  The ALJ points out that while Dr. Schuster indicated in the depression form that plaintiff has "marked" difficulties in activities of daily living and maintaining social functioning, Dr. Schuster's treatment notes include no complaints by the plaintiff supporting Dr. Schuster's conclusion that plaintiff has marked limitations in these areas.  (R. 24; see R. 444; Exhibits 3F, 14F, 15F).  The ALJ also notes Dr. Schuster's opinion, in the heart arrhythmia form, that plaintiff experiences syncope or near syncope more than once each day[22] and, also, that he suffers symptoms of palpitations, weakness, shortness of breath and chest discomfort due to heart arrhythmias more than once a day; the ALJ points out, accurately, that "[o]nce again, the treatment records do not reflect these symptoms reported by the claimant on a consistent basis." (R. 24-25; see R. 448-49; Exhibits 3F, 14F, 15F).  The ALJ also stated that the extreme limitations set forth in Dr. Durant's medical source statement – including limitations to a

_____

[22] Despite his opinion that plaintiff suffers from episodes of syncope or near syncope more than once a day, Dr. Schuster concluded that plaintiff can work occasionally (i.e., up to 1/3 of the work day) in proximity to moving mechanical parts and in high exposed places, and that he can drive automotive equipment occasionally.  (R. 449, 455-57).

maximum of two hours of sitting and a need for two hours of rest in addition to normal breaks in an eight-hour day – are not supported by Dr. Durant's treatment records.  (R. 24; see Exhibits 3F, 14F, 15F).[23]   The Eleventh Circuit has found good cause for declining to credit treating physicians' opinions where those opinions are "inconsistent with their own medical records," Roth, supra (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)); see also Vuxta v. Commissioner of Social Security, 194 Fed. Appx. 874, 876-77 (11th Cir. 2006)(finding good cause for ALJ to discredit opinion of treating psychologist that was inconsistent with treatment records).  Internal inconsistencies in a medical opinion also constitute good cause for discounting an opinion.  Knight v. Chater, 55 F.3d 309, 314 (7th Cir. 1995)(citing 20 C.F.R. § 404.1527(c)); see also Nugent v. Astrue, 278 Fed. Appx. 423, 426 (5th Cir. 2008)(quoting § 404.1527(c) language regarding internally inconsistent medical evidence).  Substantial evidence supports the ALJ's determination that Dr. Schuster's and Dr. Durant's opinions are internally inconsistent and not supported by their treatment records. The ALJ did not err in declining to credit their opinions.[24]

---

[23]  Dr. Durant indicated that plaintiff suffers from moderately severe pain due to osteoarthritis of his knee, yet – in the same form – he concluded that plaintiff can "frequently" (defined in the question as "up to 66% of an 8-hour day") push and pull arm and/or leg controls.  (R. 460, ¶¶ 6, 9).

[24]  Plaintiff complains, in part, of the ALJ's failure to take into account the possible side effects of his prescribed medications.  (Doc. # 12, pp. 7-8).  Dr. Durant noted that plaintiff's occasional use of narcotics "causes difficulties" as to his ability to work (R. 461).  However, on the same date, Dr. Durant also concluded – as to the extent prescribed medication would impact his patient's ability to perform work activity, that "[s]ome limitations may be present but not to such a degree as to create serious problem in most instances." (R. 458).  Additionally, the ALJ asked plaintiff about side effects from "all the different medicines" he takes; plaintiff responded that the only side effect he has noticed is "putting on weight[.]" (R. 42).  The ALJ addressed the effect of plaintiff's obesity, finding that it would not impose limitations that would further reduce plaintiff's RFC beyond that found by the ALJ.  (R. 19).  The ALJ was not required to address other potential side effects, when plaintiff testified that the only medication side effect he has noticed is weight gain.  Plaintiff also complains that the ALJ "failed to report the clinical findings obtained on consultative

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law. Accordingly, the decision is due to be AFFIRMED.  A separate judgment will be entered.

DONE, this 6th day of May, 2011.


/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

examination in July 2007 including right knee swelling with scar, blue hematomas in the mid right shin, 1+ pitting edema in the ankles (R. 396) with reduced range of motion in the right knee as well as the ankles bilaterally." (Doc. # 12, p. 8).  The ALJ noted that Dr. Bartel, the consultative examiner, diagnosed "hypertension *with ankle edema*." (R. 19)(emphasis added).  He further noted that plaintiff had surgery on his right knee in 2004. (R. 20).  The ALJ concluded that plaintiff has the severe impairment of arthritis of his right knee and found that he can stand and walk at least 2 hours in an 8-hour workday, can never push or pull with his right leg, and can never kneel or crawl. (R. 18, 22).  The jobs he found that plaintiff can perform are all sedentary jobs. (R. 26).  The ALJ's decision permits the court to conclude that the ALJ considered plaintiff's medical condition as a whole; he is not required to "specifically refer to every piece of evidence in his decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005)(citation omitted). Plaintiff's contention is without merit.